IN THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| vs. | ) | CRIMINAL NO. 05-00345-KD-C |
| | ) | |
| KENNETH DAVID WALL | ) | |
| | ) | |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

This matter is before the Court on the motion for judgment of acquittal made by Defendant Kenneth David Wall pursuant to Federal Rule of Criminal Procedure 29.1, filed September 25, 2006 (Doc. 290) [1] and the government's response in opposition thereto, filed November 7, 2006 (Doc. 309 ).  The Court has carefully considered the arguments in support of and in opposition to the defendant's motion. For the reasons stated herein, defendant's motion for judgment of acquittal is **GRANTED** as to the conspiracy count but **DENIED** as to the mail and wire fraud counts.  Also, defendant's motion for new trial is **DENIED.**

**I.     BACKGROUND**

The indictment in this case charged in count one that Jim Brown, along with defendants Wall, Russo and Sutley conspired to defraud (through the use of mail and wire transactions) the

---

[1] Prior to the submission of the case to the jury defendant Wall made an oral motion for judgment of acquittal pursuant to Rule 29 of the Federal Rules of Criminal Procedure.  Pursuant to the Federal Rule of Criminal Procedure 29(b), the Court reserved its' decision on the motion. After the jury's verdict, Wall filed a written motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 (c).

citizens of Orange Beach, Alabama of their right to Mayor Russo's honest services as Mayor. The conspiracy set forth multifaceted schemes in which Russo was the common beneficiary. An object of the conspiracy was to enrich the Mayor in order to gain the Mayor's support for various projects that Wall and Brown had in Orange Beach. The indictment also charged defendant Wall with substantive violations of mail and wire fraud. The substantive mail and wire fraud charges alleged that Wall "corruptly provid[ed] to Russo things of value, including profits from a land flip transaction arranged by Brown and Wall, in return for Russo's agreement to perform official acts benefitting Brown and Wall". As to Wall, the indictment alleged his specific involvement in two of the schemes, i.e., American Hot and the "land flip" property (also known as the Bankester property). No evidence was presented to support the allegation that Wall was involved in the American Hot scheme. Thus, the focus is on the evidence presented to support Wall's convictions as it relates to the "land flip" property.[2]

## II.     DISCUSSION

Defendant Wall moves the Court to enter a judgment of acquittal as to all counts on which the jury returned a guilty verdict against him on the grounds that the government evidence fails to support the guilty verdicts. (Doc. 290).

Fed. R. Crim. P. 29

In analyzing defendant's post-verdict Rule 29 motion the Court must "review the sufficiency of the evidence . . . in the light most favorable to the government" and draw "all reasonable inferences in favor of the jury' verdict. United States v. Gatlin, 2006 WL 2567587, *2 (11th Cir., September 7, 2006) (unreported opinion) citing United States v. Castro, 89 F.3d

---

[2] The jury found defendant Wall guilty on Counts One, Twelve, Thirteen, Fourteen, Seventeen and Twenty.

1443, 1450 (11th Cir.1996).  "A jury's verdict must be sustained against such a challenge if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." United States v. Alaboud, 347 F.3d 1293, 1296 (11th Cir. 2003) (internal quotations and citation omitted).  "The evidence may be sufficient even when it does not 'exclude every reasonable hypothesis of innocence or [is not] wholly inconsistent with every conclusion except that of guilt,' because a 'jury is free to choose among reasonable constructions of the evidence.'" United States v. Peters, 403 F.3d 1263, 1268 (11th Cir. 2005) (citations omitted).  Moreover, the court "accept[s] all reasonable inferences that tend to support the government's case". United States v. Ward, 197 F.3d 1076, 1079 (11th Cir. 1999).  However, the primary rule is that "the Constitution requires substantial evidence to support any criminal conviction".  U.S. v. Adkinson, 158 F.3d 1147, 1152. fn.10 (11th Cir. 1998), citing United States v. Malatesta, 590 F. 2d 1379, 1382 (1979) (en banc)

To overturn a jury verdict is an extraordinary act.  However, a conviction that is not supported by the required substantial evidence is unconstitutional.  After listening carefully to the government's evidence at trial (and taking all this evidence as true) and having the benefit of reviewing the relevant trial transcripts, it is the finding of the Court that defendant Wall's conspiracy conviction is not supported by substantial evidence.  However, the Court finds that the substantive mail and wire fraud convictions are supported by substantial evidence.

    *A.   Conspiracy*

Count One of the Indictment alleges that defendant Wall, along with co-defendants Sutley, Russo and Brown, conspired with one another to commit honest services mail and wire fraud.  The Eleventh Circuit Court of Appeals recently reiterated the proof the government must come forward with to obtain a conspiracy conviction.  See United States v. Ndiaye, 434 F.3d

3

1270 (11th Cir. 2006).   In Ndiaye, the Court opined, in pertinent part:

> In order to obtain a conviction for conspiracy under 18 U.S.C. § 371, the Government must prove (1) that an agreement existed between two or more persons to commit a crime; (2) that the defendant knowingly and voluntarily joined or participated in the conspiracy; and (3) a conspirator performed an overt act in furtherance of the agreement. See United States v. Ellington, 348 F.3d 984, 989 (11th Cir.2003). The knowledge requirement is satisfied when the Government shows a defendant's awareness of the essential nature of the conspiracy. See United States v. Lluesma, 45 F.3d 408, 410 (11th Cir.1995). A conviction for conspiracy may be obtained via circumstantial evidence.

434 F.3d at 1294.  The government's evidence established beyond a reasonable doubt that an implicit agreement existed between Jim Brown and Mayor Russo that Brown would provided financial favors to Russo and, in return, Russo would use his influence to support Brown's business endeavors in Orange Beach.  Specifically, the government's evidence showed the following: 1) Brown gratuitously provided remodeling work and materials for Russo's residence totaling thousands of dollars; 2) Brown shared his profits in the American Hot venture with Russo; 3) Brown gave Russo part of his profits from his contract with Orange Beach for debris removal; 4) Brown agreed to give Russo part of Brown's profits from the sale of the Romar Vista property in return for Russo's help in getting the property sold; 5) Brown agreed to build a new house for Russo at cost; 6) Brown provided $10,000 to Russo to purchase a car and, 7) Brown agreed to help Russo buy the "land-flip" Bankester property.   Brown testified that he provided this assistance to Russo "to protect [Brown's] livelihood in Orange Beach" and "without the Mayor's support I wouldn't have any projects".  Thus the first element, that two or more persons agreed to commit an illegal act, was established.

Next,  the government was required to prove that defendant Wall knowingly and voluntarily participated in the conspiracy between Russo and Brown.  This is the element on which the government's evidence was insufficient.  The government relied solely on Wall's

participation in the Bankester property transaction to show Wall's participation in the conspiracy. The government's case was based primarily on witness Brown. Brown testified that the availability of the Bankester property was brought to his attention by Russo, who had received a flyer promoting the sale of the property. Russo requested Brown's assistance in obtaining the property after Brown stated the property was undervalued and that there was a million dollars to be made for the person who bought the property. It was Brown's opinion that the property was worth 2 million dollars. Subsequently, Brown and Russo entered into a contract to purchase the Bankester property for 1.2 million dollars.

At the time of the Bankester property transaction, Brown was also involved in a business venture with Wall, Keith Chunn and Richard Chunn, known as Deck Investments. Deck Investments owned 62 acres[3] of land that it hoped to either develop or sell to an interested developer. The 62 acres was situated near the waterfront but did not have waterfront access. Brown testified that Deck Investments was looking for water access to enhance the value of the property. It later occurred to Brown that the Bankester property was located near the 62 acres and thus, could provide the needed water access. This occurred to Brown after he and Russo had entered into a purchase agreement on the Bankester property. At this point, estimated to be two weeks after the purchase agreement was signed, Brown advised Wall that he and Russo had under contract waterfront property that was close to the 62 acres. A discussion ensued wherein it was agreed that Brown could not profit from the sale of the land to Deck Investments. Wall then wanted to know how much Russo wanted for his interest in the property. Brown told Wall that Russo wanted a total of 1.6 million dollars for the property. After assisting Brown in removing

---

[3] At times the property was referred to as 72 acres.

Brown's name from the purchase agreement, Wall advised the Chunn's of the property, without disclosing the seller, and indicated that Deck Investments needed to move quickly as Wall expected the property to be available for only a short period of time. The Chunn's agreed to buy the property for 1.6 million dollars and the deal was consummated. Prior to Deck closing on the property, Wall requested Brown to let the Mayor know that Wall "kind of made this deal happen". Brown also testified that Wall stated in reference to the Bankester property transaction with Russo that it "wouldn't hurt anything, would it".

Concurrent with his involvement with Deck Investments, Wall was also involved in a venture with Brown which was referred to as the Water Club. The Water Club was to be a planned unit development (PUD) located in Orange Beach, Alabama. In order for the development to occur, it was necessary for Wall and Brown to obtain approval from the Orange Beach City Council, which included Russo. The application for the Water Club PUD was filed a few days after Deck Investments bought the Bankester property from Russo. However, Wall and Brown had already lobbied Russo and other city council members for their support of the Water Club project. Brown testified that there was some opposition to the project and that they needed Russo's vote in order for the project to pass.

In sum, the government's theory was that Wall's act of brokering the Bankester property to Deck Investments, while simultaneously seeking approval of the Water Club PUD, constituted a knowing participation in the well-established conspiracy between Brown and Russo. However, this theory was not supported by substantial evidence. First, and most important, the government failed to show that Wall had any knowledge of Brown's previous corrupt dealings with Russo. Brown testified for hours without indicating that Wall had any knowledge of the true relationship between Brown and Russo. Thus, the only reasonable inference from this lack

of evidence is that when Wall was approached by Brown regarding buying property from Russo for Deck Investments, Wall was not privy to the corrupt relationship that existed between Brown and Russo, i.e. he had no knowledge of the conspiracy in which he was alleged to have participated.

The government asserts in its brief that "Wall's participation in the corrupt affairs of Brown began prior to the land-flip transaction, when Wall uttered his incriminating comment at the time he and Brown were attempting to sell the Water Club concept to other developers". However, there was no substantial evidence presented at trial to support this assertion. The government relies on statements that Wall made at a meeting, that occurred four (4) months before the Bankester property transaction, with potential buyers of the Water Club. In reference to whether the Water Club PUD would receive approval, Wall stated to the potential buyers that "Brown had city hall in pretty good shape" and that Wall could "guarantee" approval of the PUD. The government argues that it is a reasonable inference from these comments that Wall was participating in the Brown-Russo conspiracy when those comments were made. However, such an inference can not be reconciled with the government's total failure to put on any evidence, particularly from Brown, that Wall had any knowledge of the corrupt relationship between Brown and Russo. In fact, although Brown did not provide evidence regarding Wall's knowledge of Brown's corrupt dealings with Russo, Brown did testify that none of the money that he paid to Russo came from any entity associated with Wall.[4]

Moreover, there was insufficient evidence that when Brown and Wall agreed to have

---

[4] The only other evidence that touches on the subject of whether Brown made his partner Wall privy to the corrupt relationship that existed between Brown and Russo was indirect and contradicts the government's theory. I.e., in a different transaction Brown testified that he operated independent of his partners when engaging in corrupt dealings with Russo. (See Brown's testimony regarding the Romar Vista property)

Deck Investments buy the Bankester property that there was any agreement (meeting of the minds) between Wall and Brown and/or Russo, implicit or otherwise, that the transaction would occur for the purpose of corruptly enriching Russo.  The government's evidence only showed that after Deck Investments decided to purchase the Bankester property, Wall expressed his desire that Russo be told of Wall's participation in the Bankester property transaction.  It is a reasonable inference that Wall's desire for recognition was in hopes of Russo's favorable consideration of Wall's projects.  However, evidence of Wall's individual hope is not sufficient to show beyond a reasonable doubt that Wall knew of and knowingly joined the ongoing conspiracy between Brown and Russo. "The essence of conspiracy is proof of a conspiratorial agreement while aiding and abetting requires there be a "community of unlawful intent" between the aider and abettor and the principal. While a community of unlawful intent is similar to an agreement, it is not the same. Thus, a defendant may wittingly aid a criminal act and be liable as an aider and abettor, but not be liable for conspiracy, which requires knowledge of and voluntary participation in an agreement to do an illegal act." U.S. v. Toler 144 F.3d 1423, 1426, fn. 4 (11th Cir. 1998) quoting United States v. Bright, 630 F.2d 804, 813 (5th Cir.1980).  Whether the inference is sufficient to establish a separate scheme by Wall to defraud or aid and abet in defrauding the citizens of Orange Beach of the honest services of their Mayor is discussed below.

  B. <u>Mail and Wire Fraud</u>

Wall was convicted of counts twelve, thirteen and fourteen which charged mail fraud, in violation of 18 U.S.C. §1341 and §2 and counts seventeen and twenty which charged wire fraud, in violation of 18 U.S.C. §1343 and §2.  To prove that Wall committed the alleged fraud, the Government had to prove that he (1) intentionally participated in a scheme to defraud; and (2)

8

used or caused to be used wire communications (counts seventeen and twenty) or mail service (counts twelve, thirteen and fourteen) to further that scheme. United States v. Brown, 40 F.3d 1218, 1221 (11th Cir.1994).   The Supreme Court has held that in addition, "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes." Neder v. United States, 527 U.S. 1, 25, 119 S.Ct. 1827, 1841, 144 L.Ed.2d 35 (1999).  The Government must also "identify of what the victim has been defrauded-for example, money, property, or the §1346 intangible right of honest services." [5]  U.S. v. deVegter,198 F.3d 1324, 1328 fn. 4 (11th Cir. 1999). The right to honest services has been fully explained by the Eleventh Circuit.

> Public officials inherently owe a fiduciary duty to the public to make governmental decisions in the public's best interest. 'If the official instead secretly makes his decision based on his own personal interests-as when an official accepts a bribe or personally benefits from an undisclosed conflict of interest-the official has defrauded the public of his honest services.' When the prosecution can prove the other elements of the wire fraud offense, taking kickbacks or benefiting from an undisclosed conflict of interest will support the conviction of a public official for depriving his or her constituents of the official's honest services because '[i]n a democracy, citizens elect public officials to act for the common good. When official action is corrupted by secret bribes or kickbacks, the essence of the political contract is violated.' Illicit personal gain by a government official deprives the public of its intangible right to the honest services of the official.

198 F. 3d at 1328 (citations omitted).   Moreover, that the result of the public official's action or vote would actually benefit the citizens does not change the fraudulent nature of the conduct. U.S. v. Lopez-Lukis, 102 F.3d 1164, 1168 fn. 13 (11th Cir. 1997)  Honest services fraud does not address the wisdom or results of an official decision, rather, it concerns the manner in which officials make their decision. Id.  Thus, illicit personal gain by a public official takes place not only when a public official takes a bribe but also when a public official benefits from an

---

[5]  The defendant argues that the honest services fraud provision is unconstitutionally ambiguous and alternatively that the rule of lenity should apply.  For reasons stated prior to trial (Doc. 216) the Court finds that the statute is not ambiguous.  Thus, the rule of lenity does not apply. Salinas v. U.S. 522 U.S. 52, 66 (1997).

undisclosed conflict of interest. The latter is what the evidence supports in this case.

The government argued that the land-flip was set up to benefit Russo. Brown's testimony supports this theory as it relates to Brown's ongoing efforts to keep Russo satisfied. However, the evidence does not support the theory as it relates to Wall. The evidence was undisputed that Wall had been unsuccessfully looking for waterfront property prior to being approached by Brown regarding the availability of Russo's property. There was no evidence that it was Wall's idea or preference to purchase from Russo, rather it was the necessary fact; Russo had control of waterfront property that would be useful to Deck Investments. Moreover, there was no dispute that Wall was acting on behalf of Deck Investments when he purchased the needed property from Russo.[6] The evidence did not support that Wall was aware that this transaction was part of Brown's ongoing effort to corruptly enrich Russo. The evidence from the government's witness was that it was thought at the time that the property was worth $2 million dollars. Deck paid $1.6 million dollars for the property. Thus, it is undisputed that Deck received legitimate value for the $400,000 profit paid to Russo.

However, this does not exonerate Wall from his convictions of committing honest services fraud through the use of the mails and wire communications. Wall's liability derives from his actions of knowingly aiding and abetting the Mayor of Orange Beach (Russo) in profiting from a known conflict of interest. The government's evidence was sufficient to establish that the Water Club PUD was a project that needed Russo's support. Moreover, Russo and other city council members were actively being lobbied by Brown and Wall at the time of the Bankester property transaction. Thus, Wall and Russo were keenly aware of the conflict that

---

[6] The government argues that Wall made material misrepresentations to the Chunns by failing to disclose the seller and telling them they needed to move quickly to purchase the property. However, the indictment does not charge Wall with defrauding the Chunns, rather it is the citizens of Orange Beach that are at issue.

existed.  Wall's awareness of the obvious conflict is supported by the fact that he kept the other partners of Deck Investments in the dark about the seller of the property.  Moreover, at the end of the transaction Wall expressed his desire to be remembered favorably for assisting in the transaction and noted that it couldn't hurt their position with Russo.  While this does not establish a agreement between Russo and Wall to violate the law it does establish a "community of unlawful intent" to violate the law.  U.S. v. Toler, 144 F. 3d  at fn. 4.  Accordingly, the government's evidence was sufficient to prove that Wall intentionally participated in a scheme to defraud the citizens of Orange Beach of the honest services (free from conflict of interest) of Mayor Russo.

The government's evidence also established that the mails and wire communication facilities were used to further the scheme.  "In order to be convicted of mail fraud, a defendant …must have known that use of the mail would follow in the ordinary course of business, or that he should have foreseen such use even though it was unintended." United States v. Rhodes, 177 F.3d 963, 966 (11th Cir. 1999).  "The mailing may be perfectly innocent as long as it is incidental to an essential part of the scheme to defraud or a 'step in the plot.'"  United States v. Mills, 138 F.3d 928, 941 (11th Cir. 1998) (citation omitted).  The three mailings at issue each materially pertained to the closing on the Bankester property.  As Wall was a real estate broker, it was certainly a reasonable inference by the jury that Wall was privy to the fact the mails would be used in the ordinary course of business to close on the property.  The same analysis applies to the wire fraud counts.  Thus, the government's evidence was sufficient to support Wall's convictions on the substantive mail and wire fraud counts.

**III.    MOTION FOR NEW TRIAL**

In the alternative, defendant Wall moves for a new trial on these counts on the grounds,

in sum, that such is required in the "interest of justice."  (Doc. 290 at 32)  "[T]here are two grounds upon which a court may grant a motion for new trial: one based on newly discovered evidence, which must be filed within three years of the verdict pursuant to Rule 33(b)(1); and the other based on any other reason, typically the interest of justice, which must be filed within seven days of the verdict, pursuant to Rule 33(b)(2)."  United States v. Campa, 459 F.3d 1121, 1151 (11th Cir. 2006).  The Court finds that the defendant's arguments in support of a new trial, including the argument that Wall's trial should have been severed from the other defendants, provide no meritorious bases for the Court to grant a new trial.  Accordingly, the motion for new trial is **DENIED**.

**IV.    CONCLUSION**

Accordingly for reasons stated fully above, the court finds that defendant, Kenneth Wall's motion for judgment of acquittal on count one (conspiracy) is **GRANTED**.  Wall's motion for acquittal on the remaining counts is **DENIED**, and Wall's motion for new trial is **DENIED.**

**DONE** and **ORDERED** this  3rd  day of  January, 2007**.**

 S/ Kristi K. DuBose  
**KRISTI K. DuBOSE**  
**UNITED STATES DISTRICT JUDGE**